UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TABITHA ROWLAND, ) | CIVIL ACTION NO.: 04 11646 MBB |
| ADMINISTRATRIX OF THE ) | |
| ESTATE OF DANNY TYSON WRIGHT, ) | |
|     Plaintiff, ) | |
| v. ) | |
| ) | |
| EAGLE EYE FISHING CORPORATION, ) | |
|     Defendants. ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I.    INTRODUCTION**

On March 12, 2002, Danny Tyson Wright was in the course of his employment as a fisherman aboard the F/V EAGLE EYE when he was brutally attacked by a fellow crew member. The assailant, Kevin Charles Dillon (aka "Jerome") slashed at and stabbed the unarmed Wright with an 8" long survival knife. Injuries from these wounds led to Wright's untimely death at the age of 41. The Estate of Danny Tyson Wright filed suit in this court for negligence under the Jones Act, 46 U.S.C. App. Sec. 688; for unseaworthiness under the general maritime law; and, for maintenance and cure under the general maritime law.

The plaintiff moves for partial summary judgment on the count for unseaworthiness. The case law is crystal-clear: a ship owner has a non-delegable duty to provide a seaworthy vessel. This duty extends not only to the vessel, but to the crew as well. The Supreme Court has established that the ship owner's duty is breached when a crew member is "not equal in disposition to the ordinary men of the calling." Boudoin v. Lykes Bros. Steamship Co., Inc., 348 U.S. 336, 340 (1955). Kevin Dillon aka Jerome's brutal and fatal stabbing of Danny Tyson Wright with an 8"

survival knife was far more than an ordinary seaman's brawl; on the contrary, it evinced a violent nature that rendered the F/V EAGLE EYE unseaworthy. The plaintiff is therefore entitled to summary judgment on the count for unseaworthiness under the general maritime law.

II.   **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

This statement of undisputed material facts is submitted pursuant to Local Rule 56.1:

1. On March 12, 2002, Danny Tyson Wright was in the employ of the Eagle Eye Fishing Corporation aboard the F/V EAGLE EYE. At this time, the crew of the F/V EAGLE EYE consisted of five members, Captain David Walton, Danny Tyson Wright, Marco Williams, Eduard McCarty, and Kevin Charles Dillon (aka "Jerome"). The F/V EAGLE EYE docked in San Juan, Puerto Rico at approximately midnight on March 12, 2002, in order to pack and unload fish from the vessel's most recent voyage. See Statement of Captain David Walton, attached as Exhibit "A."

2. At two thirty in the morning the crew began working for four (4) to five (5) hours to pack the fish in ice and unload the vessel. See Statement of Marco Henrique Williams, attached as Exhibit "B." Upon completion of the unloading, the Captain ordered the crew to clean the hold and then left the F/V EAGLE EYE to confer with another Captain. See Statement of Captain David Walton, attached as Exhibit "A."

3. While the crew was cleaning the hold, a man and woman approached the vessel and asked for the Captain. See Statement of Marco Henrique Williams, attached as Exhibit "B." The crew directed the couple to the boat where the Captain had gone. Id. At this time, Wright was in the hold loading old ice into buckets, Williams was operating the winch out of the hold, and McCarty was offloading the old ice. Id. Dillon, aka "Jerome" was not present on

the vessel. Id. After a few minutes the couple returned and informed the crew that they would like some bait fish. Id. Wright loaded some fish in a bucket for the couple and hoisted it up to the deck. Id. At this time, Dillon returned to the F/V Eagle Eye. See Statement of Marco Henrique Williams, attached as Exhibit "B."

4. Upon seeing the bucket full of fish, Dillon asked "what are you doing with the fish?" He then grabbed the bucket and dumped the contents overboard. Id. When asked why he dumped the fish, Dillon responded "cause I [] wanted to." Id. Dillon then confronted McCarty and Williams, asking "are you going to do something about it?" Id. Wright exited the hold, where Dillon confronted him. Id. Dillon pulled out a knife from a towel he had been holding since returning to the vessel. Id. The blade was nearly eight inches long. See Statement of Marco Henrique Williams, attached as Exhibit "B." Dillon swung the knife at Wright, stabbing him in the neck. Id. Dillon repeatedly struck Wright with the knife as Wright futilely attempted to fend off the attack. Id. Wright fell to the deck of the vessel and Dillon fled the scene. Id.

5. The other crew members notified the Captain and called for a paramedic. See Statement of Captain David Walton, attached as Exhibit "A." While waiting for the paramedics, Williams attempted to stop the flow of blood from Wright's chest and neck while the Captain attempted CPR. These attempts lasted nearly ten minutes, with Wright gasping for breath and fighting to survive. By the time the paramedics and police arrived, Wright was dead. See the Statement of Agent Deborah Gonzalez, attached as Exhibit "C" (Agent Gonzalez's Statement was originally in Spanish and has been translated into English by an interpreter. Both the original Spanish and the translated English versions have been attached.); see also

        Death Certificate, attached as Exhibit "D" and Report of Marine Accident, Injury or Death, attached as Exhibit "E." Agent Gonzales apprehended and arrested Dillon. Id.

6. Following the arrival of the police, an investigation was commenced. See Report of the Findings at the Scene, attached as Exhibit "F" (This report was originally in Spanish and has been translated into English by an interpreter. Both the original Spanish and the translated English versions have been attached.). The police confiscated a knife sheath, but not the knife from Dillon and noted that the deck of the F/V EAGLE EYE was covered in blood. Id. In addition to this investigation, an autopsy was conducted on Danny Wright. See Forensic Medical Report, attached as Exhibit "G" (This report was originally in Spanish and has been translated into English by an interpreter. Both the original Spanish and the translated English versions have been attached.). The medical report indicates that Wright suffered three (3) puncture wounds as the result of Dillon's attack. Id. The wounds included (1) an incision to the thorax and neck which resulted in wounds to the heart, pericardial hemorrhaging, and hemorrhaging in the thorax; (2) incision wounds to the face, side, and abdomen; and (3) Cardomegalia. Id.

7. Wright was survived by his mother, adult daughter, and grandson.

8. Kevin Dillon, aka "Jerome" was convicted of the murder of Danny Tyson Wright and is currently serving his sentence in the federal penitentiary in San Juan, Puerto Rico.

### III. LAW AND ARGUMENT

**A. Summary Judgment Standard**

A motion for summary judgment should be granted where the record shows that "the pleadings ... on file together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "[A]n issue is 'genuine' if the evidence presented is such that a reasonable jury could resolve the issue in favor of the nonmoving party." Fajardo Shopping Center, S.E. v. Sun Alliance Ins. Co. of Puerto Rico, Inc., 167 F.3d 1, 7 (1st Cir. 1999). A fact is "material" if it has the "potential to affect the outcome of the suit." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

The party moving for summary judgment "bears the initial burden." Michelson v. Digital Financial Services, 167 F.3d 715, 720 (1st Cir. 1999). However, once this burden has been met, "the onus is on the nonmoving party to present facts that show a genuine issue for trial." Id. In order to determine whether summary judgment is correct, a court should "view all facts in the light most favorable to the nonmoving party." Villanueva v. Wellesley College, 930 F.2d 124, 127 (1st Cir. 1990). The opposing party, however, "may not rest on mere allegations or denials of his pleading...." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir. 1995). In order to order to resist a motion for summary judgment, the nonmoving party must produce "definite, competent evidence" on which the nonmovant bears the ultimate burden of proof. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). See also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1996) (summary judgment should be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.")

### B. The Unseaworthiness Doctrine

Count II of the complaint in this case is a cause of action under the general maritime law based upon unseaworthiness. Unseaworthiness is a strict liability claim. The general maritime law imposes

upon a ship owner an absolute obligation to maintain his ship and its appliances, appurtenances, equipment and crew in a manner reasonably suited for their intended use. Mitchell v. Trawler Racer, Inc., 362 U.S. 539 (1960). Unlike the Jones Act, it is not necessary to prove negligence in order to recover on an unseaworthiness claim. Moreover, there is no requirement that the unseaworthy condition existed for a period of time that the vessel owner knew, or should have known, about it; unseaworthy conditions can be transitory in nature:

> The character of the duty... is absolute. It is essentially a species of liability without fault, analogous to other well known instances in our law. Derived from and shaped to meet the hazards which performing the service imposes, the liability is neither limited by conceptions of negligence nor contractual in character... It is a form of absolute duty owing to all within the range of its humanitarian policy... There is no suggestion in any of the decisions that the duty is less onerous with respect to the unseaworthy condition arising after the vessel leaves her home port, or that the duty is any less with respect to an unseaworthy condition which may be only temporary.

Mitchell, 362 U.S. at 549 (emphasis added).

### C. Assault by a Crewmember

A vessel's condition of unseaworthiness may arise from any number of circumstances, and is by no means limited to a defective condition of a physical part of the ship itself. Martinez v. Sea Land Services, Inc., 763 F.2d 26 (1st Cir. 1985)(seaworthiness warranty of fitness for duty extends to material in which ship's stores are wrapped). The warranty of seaworthiness also extends to a vessel's crew. The United States Supreme Court enunciated this rule of law in its landmark decision of Boudoin v. Lykes Bros.:

> We see no reason to draw a line between the ship and the gear on the one hand and the ship's personnel on the other. A seaman with a proclivity for assaulting people may, indeed, be a more deadly risk than a rope with a weak strand or a hull with a latent defect. The problem, as with many aspects of the law, is one of degree. Was the assault within the usual and customary standards of the calling? Or is it a case of a seaman with a wicked disposition, a propensity to evil conduct, a savage and vicious nature? If it is the former, it is one of the risks of the sea that every crew

>takes. If the seaman has a savage and vicious nature, then the ship becomes a perilous place. A vessel bursting at the seams might well be a safer place than one with a homicidal maniac as a crew member.

Boudoin v. Lykes Bros. Steamship Co., Inc., 348 U.S. 336, 340 (1955). In Boudoin, a member of the crew snuck into plaintiff's room and took a bottle of brandy from under the plaintiff's bed. When the plaintiff awoke, the crewmember attacked him with the bottle, causing serious injuries. Based upon these facts, the Supreme Court affirmed the finding of the lower court that the crewmember was not fit for his calling and rendered the vessel unseaworthy. Id. at 338

The Boudoin Court was careful to distinguish this category of violent assault from a run of the mill "sailor's brawl." Id. at 339, *citing* Jones v. Lykes Steamship Co., 204 F.2d 815 (2nd Cir. 1953).

Jones involved a quarrel between two seamen, which escalated into fisticuffs. The plaintiff broke his hip in the scuffle. In denying recovery to the plaintiff, Judge Learned Hand observed that this confrontation between two seamen did not render the vessel unseaworthy. "Sailors lead a rough life and are more apt to use their fists than office employees; what will seem to sedentary and protected persons an insufficient provocation for a personal encounter, is not the measure of the disposition of the ordinary men in the calling." Jones, 204 F.2d at 817. In reversing the lower court finding in favor of the seaman on the count for unseaworthiness, Judge Learned Hand contrasted this case to those where "the assault has been either with a weapon, or the assailant has been independently shown to have been exceptionally quarrelsome, or worse." See Keen v. Overseas Tankship Corp., 194 F.2d 515, 518 (2nd Cir. 1952)("the warranty is not that the seaman is competent to meet all contingencies; but that he is equal in disposition and seamanship to ordinary men in the calling.") Numerous cases have held that the warranty of seaworthiness is breached where a seaman wields a weapon in assaulting a fellow crewmember. See Miles v. Melrose, 882 F.2d 976 (5th Cir.

1989)(vessel unseaworthy as a matter of law where crewmember stabbed to death by fellow crew member; court reversed jury verdict for ship owner on unseaworthiness count and entered j.n.o.v. in favor of the plaintiff). See also Clevenger v. Star Fish and Oyster Co., 325 F.2d 397 (5th Cir. 1963)(vessel unseaworthy as a matter of law where crewmember drove ice pick into back of plaintiff, reversing lower court finding in favor of defendant); Keen, 194 F.2d at 518 *(*plaintiff struck by meat cleaver; finding for defendant reversed and remanded where lower court judge erroneously ruled that ship owner had to have *known* of assailant's vicious temperament); Newton v. Federal Barge Lines, Inc., 81 Ill. App. 3d 454, 401 N.E.2d 1276 (1980)("mere presence of seaman who struck plaintiff with three foot steel pipe rendered vessel unseaworthy.")

The unprovoked and deadly attack evinces that Dillon aka "Jerome" was not fit for the ordinary calling of a seaman. A minor situation on the vessel triggered an abnormally violent response by Dillon. His explosive reaction to what could not even be considered a mild provocation was not that of a seaman equal in disposition and seamanship to the ordinary men in the calling. A seaman fit for his duty would not wield an eight inch knife to fatally stab and slash an unarmed crewmember, merely because he was giving away a few leftover fish. See Statement of Marco Henrique Williams, attached as Exhibit "B". The facts and circumstances surrounding the fatal stabbing suggest that Kevin Dillon aka "Jerome" had an unusually violent disposition. He hid the knife in the towel before using it, an action which suggests that the killing was premeditated, if only for a minute. Moreover, this eight inch knife was a "survival" or "Rambo-type" knife that was designed to be used as a weapon; it certainly was not a typical fish cleaning or filleting tool. See Statement of Marco Henrique Williams, attached as Exhibit "B." Finally, the facts, even when construed in the light most favorable to Jerome, cannot lead any reasonable fact finder to the

conclusion that the stabbing was accidental. After he stabbed Wright, Jerome continued to flail at him with the knife, inflicting additional injuries. Under the case law, this rendered the vessel unseaworthy.

## CONCLUSION

The undisputed facts establish that Dillon repeatedly stabbed and slashed Danny Tyson Wright, an unarmed fellow crewmember, while both served as crew members aboard the F/V EAGLE EYE. Dillon was convicted of assault and battery, and is presently incarcerated in Puerto Rico for this heinous crime. Dillon's multiple stabbings of Danny Tyson Wright were incredibly brutal, and far beyond a garden-variety seaman's brawl. Dillon's violent disposition, as evidenced by this unprovoked fatal assault, indicates that he was not fit for the ordinary calling of a seaman. This rendered the F/V EAGLE EYE as unseaworthy (and more dangerous) as a hole in her hull. Accordingly, partial summary judgment should be granted on the plaintiff's unseaworthiness claim under the crystal-clear standards enunciated by the United States Supreme Court in Boudoin v. Lykes Bros. Steamship Co., Inc., 348 U.S. 336 (1955).

Respectfully submitted,
by her attorney,

_____
THOMAS M. BOND, ESQ.
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue
Suite 301
Boston, MA 02210
(617) 261-0080
B.B.O. #: 546649

Dated: 4-13-05

9