UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TABITHA ROWLAND,
ADMINISTRATRIX OF THE
ESTATE OF DANNY TYSON WRIGHT,
     Plaintiff,


     v.                          CIVIL ACTION NO.
                                    04-11646-MBB


EAGLE EYE FISHING CORPORATION,
     Defendant.


**MEMORANDUM AND ORDER RE:**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**
**(DOCKET ENTRY # 8)**

**July 28, 2005**

**BOWLER, U.S.M.J.**

Pending before this court is a motion for partial summary judgment (Docket Entry # 8) filed by plaintiff Tabitha Rowland ("plaintiff"), Administratrix of the Estate of Danny Tyson Wright ("Wright"). On March 12, 2002, Kevin Charles Dillon, a/k/a Jerome ("Dillon"), struck and killed Wright with a knife on board the F/V Eagle Eye, owned and operated by defendant Eagle Eye Fishing Corporation ("defendant").

The three count complaint alleges liability for negligence and wrongful death under the Jones Act, 46 U.S.C. § 688, in counts I and II and for unseaworthiness under general maritime law in Count III. Plaintiff moves for summary judgment on the unseaworthiness count. After hearing oral argument on May 25,

2005, this court took the motion (Docket Entry # 8) under advisement.

STANDARD OF REVIEW

The standard of review of a summary judgment motion is well established.  Summary judgment is appropriate "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  Poulis-Minott v. Smith, 388 F.3d 354, 362 (1st Cir. 2004) (quoting Rule 56, Fed. R. Civ. P.).  All reasonable inferences are drawn in favor of plaintiff, the nonmoving party.  See Williams v. Raytheon Company, 220 F.3d 16, 19 (1st Cir. 2000).

Facts from the summary judgment record are as follows. Inferences and resolution of materially disputed facts are drawn in favor of plaintiff in the discussion section.

BACKGROUND[1]

In the early morning hours of March 12, 2002, the F/V Eagle Eye arrived at a pier in San Juan, Puerto Rico harbor in order to pack and unload its catch.  The five member crew consisted of Captain David Walton ("Captain Walton"), Wright, Marco Williams

---

[1]  Citations to the record are provided only for direct quotations.

2

("Williams"), Eduard McCarty ("McCarty") and Dillon.

At around 2:30 a.m., the crew began "getting the fish ready to be packed."  (Docket Entry # 8, Ex. A).  The packing process began at approximately 4:00 a.m. and lasted approximately four to five hours.  After finishing the packing at around 7:00 a.m. or 8:00 a.m., the crew took a short break.

Captain Walton thereafter ordered the crew to take the ice out of the fish hold and to scrub the hold clean.  He further instructed the crew that they could then "do whatever" and would receive an advance on their pay after finishing the job.  Captain Walton then left the vessel to speak to a captain on a nearby boat.

After the crew completed about one third of the process, a man and a woman approached the vessel and asked to speak with the captain.  After the crew directed them to the nearby boat, the couple returned and asked for some fish and told Williams that they would return in a few minutes.

Dillon was not in the vicinity at the time.  Wright was in the hold putting ice in a bucket and McCarty was dumping the ice in the bucket over the side of the boat.  Williams was working the winch.

Dillon then returned to the boat while Wright was in the process of putting the fish in the bucket to take up to the deck and give to the couple.  When Dillon saw the bucket of fish coming up to the deck from the hold, he asked, "'What are you

doing with the fish?'" (Docket Entry # 8, Ex. B).[2] Williams or another crew member told Dillon that they were going to give the fish to the couple. Dillon then grabbed the bucket and dumped the bucket with the fish inside overboard.

Williams immediately asked Dillon why he had dumped the fish. Dillon replied, "'[C]ause I f****** wanted to, what are you going to do about it?'" (Docket Entry # 8, Ex. B).[3] Dillon then asked McCarty, "'[A]re you going to do something about it?'" and posed the same question to Williams. (Docket Entry # 8, Ex. B).[4] Meanwhile, Wright came out of the hold onto the deck of the boat and said to Dillon, "'[W]hy did you do something so stupid?'" (Docket Entry # 8, Ex. B).[5] While holding a towel in his hand and wiping his face on the towel, Dillon replied with the words, "'[Y]ou are f****** with the wrong nigger[.]'"

---

[2] The above statement on the part of Dillon appears in the sworn statement that Williams gave five to six hours after the incident to the Department of Justice of the Commonwealth of Puerto Rico. Neither party objects to the admission of Williams' sworn statement of what Dillon said.

Arguably, Dillon's statement amounts to a statement of the declarant's then existing state of mind. See 803(3), F.R.E. Williams' statement may constitute a sworn affidavit submitted in support of summary judgment. For purposes of summary judgment only, this court accepts the statement as part of the record. The statement's admissibility at trial presents a separate issue.

[3] See footnote two.

[4] See footnote two.

[5] See footnote two. Like Dillon's statements, Wright's statement falls within the state of mind exception to the hearsay rule. Its admissibility at trial presents a separate issue.

(Docket Entry # 8, Ex. B).[6]

Noticing that Dillon and Wright were "having words," McCarty told them, "'[C]ome on you guys got to work together.'"  (Docket Entry # 10, Ex. A).  McCarty then went to sit up on the dock and was therefore at a greater distance than Williams from both Wright and Dillon.  While sitting on the dock, McCarty looked back and "saw just kind of scrabbling" and "didn't think they were really fighting."  (Docket Entry # 10, Ex. A).[7]  McCarty was having a beer at the time.

Williams, however, saw Dillon holding a knife with an eight inch blade and six inch handle in the up position.  According to Williams, Dillon then stabbed Wright in the neck.  Wright threw up his hands and, with Dillon swinging the knife three times trying to cut Wright, Wright attempted to block the blows.  Seeing blood coming from Wright's neck, Williams tried to grab Dillon.  (Docket Entry # 8, Ex. B).  Dillon then stabbed Wright again in the chest and under his left arm.  Williams described seeing "a lot of blood."  (Docket Entry # 8, Ex. B).  Wright then stumbled and collapsed.  Williams attempted to stop the flow of blood by placing his hand over the wound.

McCarty, still sitting on the dock, saw Dillon walking towards the street with something in his hand.  McCarty then

---

[6]  See footnote two.

[7]  McCarty's sworn statement of what he personally observed is not hearsay.

looked back again at the boat and saw Williams leaning over
Wright.  According to McCarty's sworn statement, Williams told
him to call 911.  McCarty then ran to two boats asking whomever
he saw if they had a telephone and to call 911.  He then returned
to the F/V Eagle Eye and saw Captain Walton as well as Williams
with Wright.

In slight contrast to McCarty's version, Captain Walton
attests that McCarty came to him "very upset and wanted someone
to call 911, that there had been a stabbing."  (Docket Entry # 8,
Ex. A).[8]  Captain Walton then immediately returned to the vessel
and found Wright lying "in a lot of blood" with Williams "trying
to control the bleeding by putting direct pressure on [Wright's]
side."  (Docket Entry # 8, Ex. A).

Captain Walton administered CPR when Wright stopped
breathing and continued to do so for approximately eight to ten
minutes.  By the time the paramedics and police arrived, Wright
was dead.

While on patrol that morning at around 10:45 a.m., Agent
Deborah Gonzalez ("Agent Gonzalez") of the San Juan Investigative
Unit received a report of "an aggression" not involving firearms.
Upon arriving at the scene in her patrol car, she observed Dillon

---

[8]  Captain Walton's sworn statement of McCarty's statement
that there had been a stabbing falls under the excited utterance
exception to the hearsay rule.  F.R.E. 803(2).  It is a separate
issue as to whether the statement, if offered through Captain
Walton at trial, falls under this exception.

walking towards her telling her, "'that I (he?) had stabbed him in self defense.'" (Docket Entry # 8, Ex. C). She placed Dillon under arrest. Her sworn recitation of the facts reflects the following statement made by Dillon:

> Initially, Mr. Kevin Charles Dillon said that the fight that brought about this incident, was about questions over the duties on the fishing boat and it was Mr. Danny Tyson who had the knife at all times until the struggle began and he then took it away injuring Mr. Danny Tyson, in self-defense.

(Docket Entry # 8, Ex. C).[9] She notes that Dillon later "offered various contradictory versions of what happened." (Docket Entry # 8, Ex. C). Williams attests that he had never seen the knife on board the vessel prior to the incident and surmises that the knife must have been in the towel Dillon had been holding in his hand. Captain Walton's Report of Marine Accident, Injury or Death written the day after the incident states that Dillon stabbed Wright three times with "a hunting knife of [Dillon's] possession." (Docket Entry # 8, Ex. E).

---

[9] At the hearing, plaintiff argued only in general terms that what other crew members said was hearsay. Not having the benefit of a more explicit or specific argument, this court finds for purposes of summary judgment only that Dillon was speaking under the stress of the event. See F.R.E. 803(2). Agent Gonzalez' statement, given the same day, presumably constitutes a public report or record regarding her factual findings of the event. See F.R.E. 803(8). This court reserves a ruling on the separate issue of the admissibility of the statement at trial.

That said, this court does not include the Shore Manager's averment that, "Wright was both drunk and aggressive towards Mr. Dillon prior to the fight" (Docket Entry # 10, Ex. B, ¶ 5) as part of the summary judgment record. The Shore Manager lacks personal knowledge of the incident. He admits that he was not present at the time of the fight and only obtained information by speaking to various unidentified crew members.

The Forensic Medical Report includes the autopsy describing Wright's three puncture wounds.  The diagnosis summary of the report depicts the wounds and notes the following:  (1) a puncture wound to the thorax that led to an incision wound to the heart, pericardial hemorrhaging and hemorrhaging in the left thorax; (2) "[i]ncision wounds to the face, side and abdomen;" and (3) cardiomegalia.  (Docket Entry # 8, Ex. G).  The autopsy concludes that Wright died as a result of the wound to the thorax.

Prior to the March 12, 2002 incident, Dillon had not exhibited violent tendencies.  To the contrary, he had a reputation as a hard working, professional and experienced fisherman.  He did not have a reputation as an individual likely to engage in fights with other crew members.

<u>DISCUSSION</u>

As previously noted, plaintiff moves for summary judgment on the unseaworthiness cause of action set forth in Count III.  "Unseaworthiness is a cause of action that enforces the shipowner's absolute duty to provide to every member of his crew 'a vessel and appurtenances reasonably fit for their intended use.'"  <u>Poulis-Minott v. Smith</u>, 388 F.3d at 366.  In contrast to Jones Act liability, a ship owner's liability for providing a seaworthy ship "is not affected by whether the owner was or was not negligent or at fault."  <u>Underwriters at Lloyd's v. LaBarca</u>,

260 F.3d 3, 7 (1st Cir. 2001) (citing <u>Mitchell v. Trawler Racer Inc.</u>, 362 U.S. 539, 548 (1960)); <u>Ferrara v. A.V. Fishing Inc.</u>, 99 F.3d 449, 453 (1st Cir. 1996) ("liability under unseaworthiness principles is not dependent upon fault"). Simply stated, the shipowner has an "absolute duty to provide to every member of his crew 'a vessel and appurtenances reasonably fit for their intended use.'" <u>Ferrara v. A.V. Fishing Inc.</u>, 99 F.3d at 453.

Furthermore, "an unseaworthy condition may be only temporary." <u>Mitchell v. Trawler Racer Inc.</u>, 362 U.S. at 549. Liability therefore attaches even though a malfunction of a piece of equipment is "temporary and unforeseeable." <u>Ferrara v. A.V. Fishing Inc.</u>, 99 F.3d at 453. In other words, the warranty applies to both "latent as well as patent defects" on the ship. <u>Clevenger v. Star Fish & Oyster Company</u>, 325 F.2d 397, 400 (5th Cir. 1963).

It is also well established that the duty extends to providing a seaworthy crew. The Supreme Court first extended the doctrine to a vessel's crew in <u>Boudin v. Lykes Brothers S.S. Co.</u>, 348 U.S. 336 (1955). <u>Boudin</u> involved a savage and unprovoked attack on the part of a deck maintenance man, Manuel Gonzales, during the course of a drinking party.[10] <u>Boudin v. Lykes Brothers S.S. Co.</u>, 348 U.S. at 337. Gonzales awoke Boudin from his bunk and attacked him with a bottle of brandy from beneath

---

[10] The autopsy of Wright showed a blood alcohol level of .21%.

9

Boudin's bed.  Boudin v. Lykes Brothers S.S. Co., 348 U.S. at

337.  Shortly after striking Boudin with the bottle, Gonzales

returned "with a large knife which he also intended to use on

him" and when Boudin "was taken to the ship's hospital, Gonzales

created a disturbance outside" and threatened the mate.  Boudin

v. Lykes Brothers S.S. Co., 348 U.S. at 337.  Explicitly

cautioning that the warranty of seaworthiness "does not mean that

the shipowner is liable for injuries 'resulting from every

sailor's brawl,'" the Court in Boudin explained that:

> We see no reason to draw a line between the ship and the
> gear on the one hand and the ship's personnel on the other.
> A seaman with a proclivity for assaulting people may,
> indeed, be a more deadly risk than a rope with a weak strand
> or a hull with a latent defect.  The problem, as with many
> aspects of the law, is one of degree.  Was the assault
> within the usual and customary standards of the calling?  Or
> is it a case of a seaman with a wicked disposition, a
> propensity to evil conduct, a savage and vicious nature?  If
> it is the former, it is one of the risks of the sea that
> every crew takes.  If the seaman has a savage and vicious
> nature, then the ship becomes a perilous place.  A vessel
> bursting at the seams might well be a safer place than one
> with a homicidal maniac as a crew member.

Boudin v. Lykes Brothers S.S. Co., 348 U.S. at 336.

Applied to members of the crew, the warranty of

seaworthiness imposes an absolute duty upon the shipowner to

provide a vessel with seaman who are "equal in disposition and

seamanship to the ordinary men in the calling."  Connolly v.

Farrell Lines, Inc., 268 F.2d 653, 655 (1st Cir. 1959); accord

Miles v. Melrose, 882 F.2d 976, 981 (5th Cir. 1989) (to establish

"unseaworthiness, a plaintiff must prove that the crew member was

not 'equal in disposition and seamanship to the ordinary men in
the calling'"); <u>Clevenger v. Star Fish & Oyster Company, Inc.</u>,
325 F.2d 397, 400 (5th Cir. 1963) (warranty requires seaman to be
"'equal in disposition and seamanship to the ordinary men in the
calling'").  A seaman who possesses "'a wicked disposition, a
propensity to evil conduct, a savage and vicious nature'" fails
to meet the seaworthy standard.  <u>Connolly v. Farrell Lines, Inc.</u>,
268 F.2d at 656; <u>accord</u> <u>Miles v. Melrose</u>, 882 F.2d at 981 (a
seaman "fails to meet the seaworthy standard only if he possesses
a savage and vicious nature").

    "[W]hat constitutes fitness is largely a fact-specific
inquiry." <u>Miles v. Melrose</u>, 882 F.2d at 981-982; <u>accord</u>
<u>Clevenger v. Star Fish & Oyster Company, Inc.</u>, 325 F.2d at 402
(whether warranty is breached from an assault is "[o]rdinarily .
. . a question of fact to be determined by the trier of fact").
It is therefore worth examining the facts underlying the Fifth
Circuit's decision in <u>Clevenger</u>, a case relied upon by
plaintiff[11] where the court found that the seaman's conduct

_____

    [11]  Other cases relied upon by plaintiff, <u>Keen v. Overseas
Tankship</u>, 194 F.2d 515 (2nd Cir. 1952), and <u>Newton v. Federal
Barge Lines, Inc.</u>, 401 N.E.2d 1276 (Ill.App.Ct. 1980), are
distinguishable on the basis that the decisions did not establish
liability as a matter of law.  The court in <u>Keen</u> reversed the
district court due to incorrect jury instructions involving the
unseaworthiness count and ordered a new trial as opposed to a
verdict for the plaintiff.  The court in <u>Newton</u> affirmed the
lower court's denial of the defendant's motion for a judgment
notwithstanding the verdict.  The jury in <u>Newton</u> rendered a
verdict in favor of the victim on the unseaworthiness claim and
the lower court denied the defendant's post trial motion for a

breached the warranty of seaworthiness and reversed the district court's rejection of the doctrine with instructions to determine the amount of damages, with the First Circuit's decision in Connolly, a case relied upon by defendant where the court affirmed the district court's directed verdict rejecting the unseaworthiness claim.[12]

Clevenger involved a first mate who stabbed the victim in the back while he was looking the other way after an exchange of "seaman's unpleasantries." Clevenger v. Star Fish & Oyster Company, Inc., 325 F.2d at 398; Miles v. Melrose, 882 F.2d at 982 (summarizing Clevenger). Although the chosen weapon, a four foot long ice chisel, is somewhat similar to the hunting knife employed by Dillon, both Dillon and Wright were "scrabbling" and, even more noteworthy, Dillon did not in an unprovoked manner climb a ladder, approach Wright and stab him in the back while he was facing the other way. Cf. Clevenger v. Star Fish & Oyster Company, Inc., 325 F.2d at 398 (describing incident as occurring after exchange of unpleasantries and then "without word or warning, Whitaker climbed a ladder to the deck at a time when Clevenger was facing the other way and drove a 'devil's fork' deep into Clevenger's back"). The facts in the case at bar,

---

judgment notwithstanding the verdict.

[12] Thus, whereas Clevenger may establish a ceiling requiring a finding in the victim's favor as a matter of law, Connolly establishes a bottom requiring dismissal in favor of the shipowner.

viewed in defendant's favor, are therefore slightly less
foreboding than the unmistakably premeditated and vicious attack
with a deadly weapon presented in Clevenger.

The facts in Connolly involved a victim who admittedly
consumed seven beers and was armed with a broken bottle, albeit
one hidden in his pocket, at the time when the victim approached
the assailant who then "lunged at" the victim "and struck him on
the head with a three foot plank." Connolly v. Farrell Lines,
Inc., 268 F.2d at 654-656. The facts in the case at bar are more
egregious than those in Connolly inasmuch as Wright was not armed
and had not approached Dillon to the degree of the plaintiff in
Connolly.

The First Circuit in Connolly also instructs that "the
assailant's savage disposition can be proven *either* by
independent evidence of his quarrelsome nature or by the fact
that a weapon was used by the assailant." Connolly v. Farrell
Lines, Inc., 268 F.2d at 656 (emphasis added). Viewing the facts
in defendant's favor, there was no independent evidence of a
savage disposition. To the contrary, Dillon was a professional
seaman who never exhibited violent behavior.

Turning to the assault itself, the issue is undoubtedly
close as to whether the record establishes Dillon's savage and
violent nature as a matter of law. Dillon employed a deadly
weapon and Wright suffered a number of wounds. Mindful that

13

breach of the warranty in the context of an assault is ordinarily an issue of fact, however, the circumstances fall just short of establishing such a breach as a matter of law. The attack occurred during the course of "scrabbling" as opposed a situation where the assailant searched out a sleeping victim. <u>See generally</u> <u>Connolly v. Farrell Lines, Inc.</u>, 268 F.2d at 656 (noting that "we do not think that the circumstances of this assault per se were such as to prove that Phillips was of a vicious nature" and further noting that "[t]his was not a premeditated attack with an unmistakably deadly weapon such as a meat cleaver"). The knife may or may not have been hidden under the towel. If a trier of fact accepts defendant's version and all reasonable inferences, it cannot be said that the assault established per se that Dillon was of a vicious and savage nature.

Having admittedly struggled with this close case, this court concludes that on the present record defendant is not entitled to summary judgment on the unseaworthiness issue. Whether a directed verdict will be warranted at trial is a separate matter.

<u>CONCLUSION</u>

In accordance with the foregoing discussion, the motion for partial summary judgment (Docket Entry # 8) is **DENIED**.

14

_\_/s/ Marianne B. Bowler_____
**MARIANNE B. BOWLER**
United States Magistrate Judge